(C.D. 4095)

UNIVERSITY OF OREGON
GEORGE S. BUSH & Co., INC. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 20, 1970)

*Glad & Tuttle* (*George R. Tuttle, Jr.,* and *Hudson F. Edwards* of counsel) for the plaintiffs.

*William D. Ruckelshaus,* Assistant Attorney General (*Steven R. Sosnov* and *Urban S. Mulvehill,* trial attorneys), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: This case involves an apparatus invoiced as a "Monark Bicycle Ergometer" that was imported from Sweden in 1965 and entered at Portland, Oregon. It was classified by the government as other medical apparatus under item 709.27 of the tariff schedules and assessed duty of 36 percent ad valorem.[1] Plaintiffs claim that it is properly classifiable under item 678.50 as a machine not specially provided for, dutiable at 10 percent ad valorem.[2]

An ergometer is an instrument for measuring and recording the amount of energy used or work done. It is in some respects similar to a conventional bicycle since it has a seat, handlebars and a frame. However, instead of conventional bicycle wheels, the ergometer has a large flywheel which is turned by a chain-driven sprocket and driving chain. Pedal resistance is controlled by tightening a friction belt (called a Swedish strap) around a flywheel and the resultant drag is measured by the movement of a weighted pendulum. In this manner, the work load can be rather precisely controlled. From the readings on the pendulum over a period of time, the amount of work a person is performing can be measured and by adjusting the friction the amount of work can be increased or reduced.

Plaintiffs' argument is that the tariff provision for "medical instruments" includes only instruments and apparatus which are used in the professional practice of medicine for the diagnosis, prevention, or treatment of diseases. And an ergometer, the argument continues, is merely a device which is solely used to subject a person to work at a measured or predetermined rate and is not chiefly used in the diagnosis or treatment of disease.[3] Defendant's position is that plaintiffs have

---

[1] Schedule 7, Part 2, Subpart B of the tariff schedules covers in part:

Medical, dental, surgical and veterinary instruments and apparatus (including electro-medical apparatus and ophthalmic instruments), and parts thereof:

\*       \*       \*       \*       \*       \*       \*

709.27   Other _____ 36% ad val.

[2] Plaintiffs also claimed alternatively that the import was classifiable (1) under item 712.50 as an electrical measuring and checking device; and (2) under item 709.40 as a mechano-therapy appliance. Plaintiffs specifically abandoned the item 712.50 claim; additionally, they neither presented evidence in support of nor argued the item 709.40 claim in their brief. The latter claim is therefore deemed abandoned.

[3] In passing we note that the *Tariff Classification Study, First Supplemental Report* (1962), p. 73, indicates that the term "medical instruments and apparatus" is not limited solely to articles used in the practice of medicine in diagnosing, preventing or treating diseases or illness. For that reference states in part:

Items 709.01–27 – medical, dental, surgical, and veterinary instruments and apparatus : A statement filed with the Ways and Means Committee asks that the superior heading to these items be clarified by adding the following underscored language thereto :

Medical, dental, surgical and veterinary instruments and apparatus (including examining, diagnostic and operating instruments and electro-medical apparatus and opthalmic [sic] instruments), and parts thereof :

*Explanation:* While the Commission is in agreement with the submission as to the intended scope of the provision, it believes that the provision as presently worded is sufficiently clear and will accomplish the desired result.

failed to rebut the presumption that the importation was chiefly used as medical apparatus.

There is no doubt, of course, that item 709.27 is a use provision and, as such, classification thereunder is determined by chief use. See e.g., *Schick X-Ray Co., Inc.* v. *United States*, 62 Cust. Ct. 97, 100, C.D. 3689, 295 F. Supp. 302 (1969). In turn, chief use for tariff schedule purposes is defined in Rule 10(e) of the General Headnotes and Rules of Interpretation of the schedules, as follows:

> 10. *General Interpretative Rules.* For the purposes of these schedules—
>
>     \*        \*        \*        \*        \*        \*        \*
>
> (e) in the absence of special language or context which otherwise requires—
>
>     (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;
>
>     \*        \*        \*        \*        \*        \*        \*

Further, "[i]t is well settled that chief use is a question of actual fact which must be established on the basis of positive testimony representative of an adequate geographical cross section of the country. The court is reluctant to disturb the collector's classification in the absence of unequivocal proof successfully contradicting the validity of such classification. *L. Tobert Co., Inc., American Shipping Co.* v. *United States*, 41 CCPA 161, C.A.D. 544 (1953)." *Schick X-Ray Co., Inc.* v. *United States, supra,* 62 Cust. Ct. at 101. "It is also well settled that evidence limited to use in one state, or in one part of the country, is insufficient to fulfill the territorial requirement of proof of chief use, unless it be shown that the area of established use is the principal or only area of use \* \* \*." *Hoffschlaeger Company, Ltd., et al.* v. *United States*, 60 Cust. Ct. 497, 501, C.D. 3440, 284 F. Supp. 787, 790 (1968).

With this as background, we now turn to the evidence to determine whether plaintiffs have overcome the presumption that ergometers are chiefly used as medical apparatus. The evidence thus presented consists of the testimony of one witness—called by plaintiffs—who has a doctorate degree in the field of physical education and is employed by the University of Oregon as an assistant professor in that field. In the course of his employment, he utilizes ergometers for experiments directed towards the study of the physiological effects of exercise or work. The witness testified that at the University of Oregon the ergometer is used solely for measuring the amount of work a person can perform in a given period of time or the amount of time it takes a

subject to reach the limit of his work capacity. According to the witness, the ergometer is a tool which puts a subject in a particular state so that certain physiological changes, such as heart rate, oxygen uptake and consumption, blood pressure and skin resistance, can be measured. He further testified that the primary purpose of the physiological studies in the physical education field is to determine better methods to train people (e.g., athletes) in work and exercise performance. He added that he had seen ergometers in other laboratories similar to his own. The witness further stated that, in his opinion, the medical profession uses the ergometer in a clinical way in conjunction with patients suffering from heart disease. However, he had never observed the ergometer being used by a doctor. Nor did he know personally how ergometers were used in the eastern part of the United States.

In short, the testimony of this witness would indicate that ergometers are used: (1) to conduct physiological experiments in conjunction with athletics and work; (2) clinically by medical doctors in conjunction with heart patients; and (3) (possibly) for mere physical exercise. But there is no evidence whatever to show (i) which, if any, of these uses represents the ergometer's chief use; or (ii) that the ergometer is not chiefly used as medical apparatus. In the absence of such evidence, we must conclude that plaintiffs have not overcome the presumption attendant upon the government's classification that the ergometer is chiefly used as medical apparatus.

Misplaced is plaintiff's reliance on *Schick X-Ray Co., Inc.* v. *United States, supra,* 62 Cust. Ct. 97. In *Schick,* electrically operated cycle ergometers were classified by the government under paragraph 360 of the Tariff Act of 1930, as modified, as laboratory apparatus. The importer claimed they were properly classifiable under paragraph 353 as "Electrical therapeutic (including diagnostic) apparatus." The court held that plaintiff had failed to show that the ergometers (1) were chiefly used for the diagnosis of disease in connection with the therapeutic treatment of patients and (2) were not chiefly used in laboratories for purposes of experiment or study. In this context, plaintiffs argue that the testimony of their witness in the present case, in conjunction with the testimony of the witness for defendant in *Schick,* establishes (1) that the chief use of the ergometer is to indicate the measure of work being performed by a subject; and (2) that it is not used by a physician in professional practice to diagnose, treat, or prevent illness. We do not agree. Leaving aside the fact that the issue in *Schick* was not the same as the issue here, it is to be observed that the record in *Schick* was not incorporated in the record of the present case. But even if it were, this still would not advantage plaintiffs. The testimony in *Schick* to which plaintiffs make reference was presented on defendant's behalf by a physician and chairman of the

Physical Rehabilitation Department at a medical school who in the court's words (62 Cust. Ct. at 99–100) :

> stated that when he studied a person who had used the ergometer, he determined the subject's metabolism, energy expenditure, and heart rate, and he evaluated those factors.

> [He] * * * stated that the cycle ergometer merely indicates the measure of work performed by a patient or subject, but if he used other equipment, he could evaluate or "diagnose" such factors as coordination of movement, electromicrographic potential, metabolism, psychogalvanic reflexes, conditioning, electroencephalic reactions and others related to the fatigue of the subject. It was further pointed out by the witness that an ergometer alone would not tell him whether a subject had a disease, but that normally other equipment must be employed.

The court in *Schick* observed that while this testimony clearly disclosed the suitability of the cycle ergometer for laboratory use, it was insufficient in itself to establish that that was its chief use. 62 Cust. Ct. at 103.[4] And it is equally apparent that the addition of plaintiffs' testimony in the present case is still far from sufficient to establish chief use.

The protest is overruled. Judgment will be entered accordingly.

(C.D. 4096)

---

[4] The court in *Schick* also noted that plaintiff's witness had testified that all the ergometers his company had imported since 1957 "were sold to cardiovascular departments of hospitals and clinics all over the United States" ; that the ergometers were engineered for the purpose of diagnosing cardiovascular conditions ; and that he knew of no use other than for that purpose. Id. at 99. The court found that although this testimony indicated that cycle ergometers were used in cardiovascular clinics in connection with patients suffering from cardiovascular disease, it was unable, on the record before it, to conclude that this constituted the chief use of the apparatus. Id. at 102–03.